## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF ANIMALS, <br><br> Plaintiff, <br><br> v. <br><br> SALLY JEWELL, *in her official capacity as Secretary of Interior, et al.,* <br><br> Defendants, <br><br> v. <br><br> SAFARI CLUB INTERNATIONAL, <br><br> Defendant-Intervenor. | Civil Action No. 14-cv-0357 (BAH) <br><br> Judge Beryl A. Howell |

## MEMORANDUM OPINION

Friends of Animals, an animal advocacy organization, brings suit against the National

Fish and Wildlife Services ("FWS") and United States Department of Interior (collectively "the

Federal Defendants"), for a judgment declaring Title I, Section 127 of the Consolidated

Appropriations Act, 2014 ("Section 127") unconstitutional or, alternatively, declaring that the

Reinstatement of the Regulation That Excludes U.S. Captive-Bred Scimitar-Horned Oryx,

Addax, and Dama Gazelle From Certain Prohibitions ("Reinstatement Rule"), 79 Fed. Reg.

15,250 (March 19, 2014), violates the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et*

*seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*[1]  *See* First Amended

Compl. for Injunctive and Declaratory Relief ("Am. Compl."), ECF No. 10.  Now pending

---

[1]Although plaintiff's Amended Complaint claims that the Reinstatement Rule violates both Section 10(c) and Section 10(d) of the ESA, the plaintiff has expressly waived its claim regarding Section 10(d). *See* Pl's Mot. for Summ. J. at 1 n.1, ECF No. 16.

before the Court is the plaintiff's Motion for Summary Judgment, ECF No. 16, the Federal

Defendants' Cross Motion for Summary Judgment, ECF No. 17, and the Defendant-Intervenor

Safari Club International's Cross-Motion for Summary Judgment, ECF No. 20.  For the reasons

stated below, summary judgment is granted in favor of the Federal Defendants and the

Defendant-Intervenor.

## I.    BACKGROUND

The factual background of this dispute has been explained in great detail by this Court in

*Safari Club International v. Jewell*, 960 F. Supp. 2d 17, 22–46 (D.D.C. 2013), a related case in

which all the present parties participated.  Accordingly, the Court will summarize below only

those issues most relevant to the present dispute.

This case involves issues surrounding the most effective method to conserve three

antelope species—the scimitar-horned oryx, dama gazelle, and addax—whose herds have

dwindled, if not disappeared, from their native environments in North Africa.[2]  As of June 2013,

"[t]he oryx is believed to be extirpated in the wild, the addax numbers fewer than 300, and the

dama gazelle numbers fewer than 500."  12-Month Findings on Petitions to Delist U.S. Captive

Populations of the Scimitar-horned Oryx, Dama Gazelle, and Addax, 78 Fed.Reg. 33,790 (June

5, 2013).  Despite dwindling wild populations, captive populations of the three antelope species

exist in the United States and other parts of the world.  As of 2013, the FWS cited estimates from

the Sahelo-Saharan Interest Group that there were "about 4,000–5,000 scimitar-horned oryx,

---

[2] The scimitar-horned oryx, which once had an extensive range in North Africa, stands about 47 inches tall and weighs about 450 pounds with a generally pale coat and dark, reddish-brown neck and chest. *See* Listing Rule, 70 Fed. Reg. at 52,319. Adult oryx possess a pair of horns curving back in an arc up to 50 inches. *See id.* The addax, which once existed throughout the deserts and sub-deserts of North Africa, from the Atlantic Ocean to the Nile River, stands about 42 inches tall and weighs around 220 pounds with a grayish-white coat and spiral horns which twist up to 43 inches long. *See id.* The dama gazelle, the largest of the gazelles and the smallest of the three antelope species at issue in this suit, was once common and widespread in arid and semi-arid regions of the Sahara. This animal is about 39 inches tall at the shoulder and weighs about 160 pounds with a mostly reddish-brown body, but a white head, rump, and underparts. *See id.*  The dama gazelle's horns extend back and up, reaching a length of about 17 inches long. *See id.*

1,500 addax, and 750 dama gazelle in captivity worldwide." *Id.* at 33,791; *see also* Final Rule to

List the Scimitar-Horned Oryx, Addax, and Dama Gazelle as Endangered ("Listing Rule"), 70

Fed. Reg. 52,319, 52,322 (Sept. 2, 2005).

The FWS, which is vested with the authority to designate the three antelope species as

endangered under the ESA, has spent two decades considering the three antelope species with

input from both commercial and non-profit groups interested in conserving the species for

different ends.  These efforts culminated with the issuance, in 2005, of two rules, one of which

listed the three antelope species as endangered (the "Listing Rule") and the other of which

provided a blanket exemption for U.S. captive-bred herds of the same species (the "Captive-bred

Exemption").  *See* Listing Rule, 70 Fed. Reg. 52,319; Exclusion of U.S. Captive-Bred Scimitar-

Horned Oryx, Addax, and Dama Gazelle from Certain Prohibitions ("Captive-bred Exemption"),

70 Fed. Reg. 52,310 (September 2, 2005).  The Captive-bred Exemption permitted "otherwise

prohibited activities that enhance the propagation or survival of the species[,]" including "take;

export or re-import; delivery, receipt, carrying, transport or shipment in interstate or foreign

commerce, in the course of commercial activity; or sale or offering for sale in interstate or

foreign commerce."  *See* Captive-bred Exemption, 70 Fed.Reg. at 52,311, 52,317.

The Captive-bred Exemption was almost immediately challenged in court.  Two sets of

plaintiffs—including the plaintiff in the present dispute, Friends of Animals—filed lawsuits in

the United States District Court for the Northern District of California and the United States

District Court for the District of Columbia.  The lawsuits were consolidated in this jurisdiction.[3]

*See Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 105–06 (D.D.C. 2009).  In the

---

[3] Prior to consolidation, the court in the Northern District of California ruled on a motion to dismiss for lack of
subject matter jurisdiction, which challenged those plaintiffs' standing to bring suit.  The court held that the
"Defenders of Wildlife [had] standing to pursue its claim that the [FWS] violated § 10 of the ESA by issuing a
regulation which permits the taking of the three antelope species on a categorical rather than case-by-case basis."
*See Cary v. Hall*, No. 05-4363, 2006 WL 6198320, *13 (N.D. Cal. Sept. 30, 2006).

consolidated lawsuit, the plaintiffs alleged that the FWS unlawfully promulgated the Captive-bred Exemption in violation of several sections of the ESA and the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq. See id.* at 106. In ruling on the parties competing motions for summary judgment, the court first determined that the plaintiffs had standing only "to pursue their claim that the FWS violated subsection 10(c) of the [ESA] when it promulgated the [Captive-bred Exemption.]" *Id.* at 114–15. The court then granted summary judgment in favor of the plaintiffs because the Captive-bred Exemption violated Section 10(c) of the ESA, which provides that "[t]he Secretary shall publish notice in the Federal Register of each application for an exemption or permit which is made under this section." 16 U.S.C. § 1539(c). Specifically, the court determined "that the text, context, purpose and legislative history of [Section 10] make clear that Congress intended permits for the enhancement of propagation or survival of an endangered species to be issued on a case-by-case basis following an application and public consideration of that application" rather than in the form of a blanket exemption. *Friends of Animals*, 626 F. Supp. 2d at 115. The court "remanded" the consolidated cases to the FWS "for further proceedings consistent with the memorandum opinion[,]" leaving the decision of how best to proceed to the agency's discretion. *See* Order, No. 04-cv-01660, ECF No. 85-1, at 1; Order, No. 06-cv-02120, ECF No. 44-1, at 1.

In response to the court's decision declaring the Captive-bred Exemption invalid, various organizations sought to delist the three antelope species, while the FWS took steps to revoke the Captive-bred Exemption. On July 7, 2011, the FWS published a proposed rule to withdraw in full the Captive-bred Exemption. *See* Removal of the Regulation that Excludes U.S. Captive–Bred Scimitar–Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions, 76 Fed. Reg. 39,804 (July 7, 2011) ("Proposed Removal Rule"). On January 5, 2012, the FWS issued its final

rule removing the Captive-bred Exemption, effective April 4, 2012.  *See* Removal of the

Regulation that Excludes U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle

from Certain Prohibitions ("Removal Rule"), 77 Fed. Reg. 431 (January 5, 2012).  The agency

issued the Removal Rule as a necessary step to comply with the 2009 decision in *Friends of*

*Animals*.  The Removal Rule explained that:

> This change to the regulations is in response to a court order that found that the
> rule for these three species violated section 10(c) of the [ESA]. These three
> antelope species remain listed as endangered under the [ESA], and a person will
> need to qualify for an exemption or obtain an authorization under the current
> statutory and regulatory requirements to conduct any prohibited activities.

Removal Rule, 77 Fed. Reg. at 431.

Shortly after the FWS issued the Proposed Removal Rule, but before issuance of the final

Removal Rule, Safari Club International ("SCI") filed suit in this jurisdiction alleging that the

Federal Defendants violated the ESA and the APA by including U.S. captive-bred herds of the

three antelope species in the 2005 listing determination in the first instance, failing to remove

U.S. captive-bred herds from endangered species status after the 2009 decision in *Friends of*

*Animals*, and failing to respond in a timely manner to SCI's 2010 petition for delisting.  *See*

*Safari Club Int'l*, 960 F. Supp. 2d at 40.   Thereafter, the Exotic Wildlife Association filed suit in

this Court on March 2, 2012, to invalidate and set aside the Removal Rule.  *See id.* at 41.

Following consolidation of these two actions, this Court granted Friends of Animals'

motion to intervene as a defendant, as well as the motion of one other animal conservation

organization.  *See Safari Club Int'l v. Salazar*, 281 F.R.D. 32 (D.D.C. 2012).[4]  Following

extensive briefing, this Court upheld the Removal Rule as a "rational response" to the court's

---

[4] As part of its ruling permitting intervention, this Court determined that Friends of Animals possessed standing to proceed as a party in the suit.  *See Safari Club Int'l*, 281 F.R.D. at 41 (concluding that Friends of Animals "would suffer an informational injury if the plaintiffs' succeed in setting aside the Final Rule").

2009 ruling in *Friends of Animals* holding the Captive-bred Exemption invalid.  *See Safari Club Int'l v. Jewell*, 960 F. Supp. 2d at 84.[5]

This Court's ruling did not conclude the litigation, however.  On January 17, 2014, President Obama signed into law the Consolidated Appropriations Act, 2014.  Title I, Section 127 of the Act provides:

> Before the end of the 60-day period beginning on the date of enactment of this Act, the Secretary of the Interior shall reissue the final rule published on September 2, 2005 (70 Fed. Reg. 52310 et seq.) without regard to any other provision of statute or regulation that applies to issuance of such rule.

Pub. L. No. 113-76, 128 Stat. 5, § 127.  In other words, Congress mandated that the Secretary of the Interior re-issue the Captive-bred Exemption.  On March 19, 2014, FWS complied with Section 127 and reinstated the Captive-bred Exemption.  *See* Reinstatement of the Regulation That Excludes U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions ("Reinstatement Rule"), 79 Fed. Reg. 15,250 (March 19, 2014).

All of this leads to the present dispute.  After issuance of the Reinstatement Rule, Friends of Animals brought this suit against the Federal Defendants alleging that the Reinstatement Rule violated the ESA and the APA, *see* Am. Compl. at ¶¶ 90–97, and that Section 127 violated the Constitution, *see* id. at ¶¶ 86–89.  Subsequently, Safari Club International intervened as a defendant in the suit.  *See* Minute Order (April 2, 2014).  Now pending before the Court is the plaintiff's Motion for Summary Judgment, ECF No. 16, which is opposed by both the Federal Defendants and the defendant-intervenor Safari Club International, which parties have filed cross-motions for summary judgment, *see* ECF Nos. 17 and 20, respectively.

---

[5] This Court's decision is currently on appeal to the D.C. Circuit.  The D.C. Circuit has held the case in abeyance pending resolution of the present motions.  *See* Order, Case No. 13-5300, Doc. No. 1494915-2 (D.C. Cir. June 17, 2014).  A related case pending before this Court, *Friends of Animals v. Ashe*, No. 13-cv-1580, is currently stayed pending resolution of the motions for summary judgment in the present case, which may moot the plaintiff's challenge in that case.  Accordingly, concurrently with the issuance of this Opinion, the Court will direct the parties in *Friends of Animals v. Ashe*—the same parties to this suit—to file a joint status report indicating whether the stay should be lifted and a proposed schedule for future proceedings.

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted when the court finds, based upon the pleadings, depositions, and affidavits and other factual materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a), (c); *see Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  "A genuine issue of material fact exists if the evidence, 'viewed in a light most favorable to the nonmoving party,' could support a reasonable jury's verdict for the non-moving party." *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013) (quoting *McCready v. Nicholson,* 465 F.3d 1, 7 (D.C. Cir. 2006)).

In APA cases involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases).  Accordingly, this Court need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions."  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996).  Judicial review is limited to the administrative record, since it "is black-letter administrative law that in an [Administrative Procedure Act] case, a reviewing court should have before it neither more nor less information that did the agency when it made its decision."  *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal citations and quotation marks omitted; alteration in original); *see* 5 U.S.C. § 706(2)(F) ("[T]he Court shall review the whole record or those parts of it cited by a party . . . ."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (in applying the arbitrary and

capricious standard under the APA, "[t]he focal point for judicial review should be the administrative record already in existence . . . ." (quoting *Camp v. Pitts,* 411 U.S. 138, 142 (1973)).

## III.   DISCUSSION

Before turning to the merits of the plaintiff's claims, both the Federal Defendants and the defendant-intervenor challenge the plaintiff's standing, which is a threshold issue requiring resolution.  The Court will therefore first examine the plaintiff's standing to bring each claim in this suit, concluding that the plaintiff maintains standing only to challenge whether the Reinstatement Rule violates Section 10(c) of the ESA.  The Court next addresses whether the Reinstatement Rule violates Section 10(c) of the ESA, concluding that it does not.

### A.      The Plaintiff's Standing

Article III of the Constitution restricts the power of federal courts to hear only "Cases" and "Controversies."  "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 (2014) (alterations in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, (1992)).

The Supreme Court has explained that "the irreducible constitutional minimum of standing contains three elements."  *Defenders of Wildlife*, 504 U.S. at 560.  A claimant must show: (1) he or she has suffered an "injury in fact" that is (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical;" (2) there must be "a causal connection between the injury and the conduct complained of" such that the injury is "fairly traceable to the challenged action of the defendant;" and (3) it must be "likely," as opposed to merely speculative, that the injury will be "redressed by a favorable judicial decision."  *Id.* (internal

quotations omitted).  In short, "[t]he plaintiff must have suffered or be imminently threatened

with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action

of the defendant and likely to be redressed by a favorable judicial decision."  *Lexmark Int'l, Inc.*

*v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1386 (2014).

Importantly, "a plaintiff must demonstrate standing for each claim he seeks to press and

for each form of relief that is sought."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734,

(2008) (internal quotations omitted).  As explained below, the plaintiff has standing to challenge

whether the Reinstatement Rule violates Section 10(c) of the ESA, but lacks standing to pursue

its constitutional challenge to Section 127.

### 1.    The Plaintiff Has Informational Standing to Challenge Whether the Reinstatement Rule Violates Section 10(c) of the ESA.

The Court does not write on a blank slate in determining whether this plaintiff has

standing to challenge the Reinstatement Rule as violative of Section 10(c) of the ESA.  Rather,

the plaintiff's standing to challenge the Captive-bred Exemption (the precursor to the

Reinstatement Rule) has been dealt with in great detail in several prior decisions.  On one prior

occasion, a court in this District analyzed whether Friends of Animals had standing to challenge

whether the Captive-bred Exemption violated Section 10(c) of the ESA.  *See Friends of Animals*

*v. Salazar*, 626 F. Supp. 2d at 108.  Similarly, in a precursor suit, a court from a different District

analyzed whether a different conservation organization had standing to challenge whether the

Captive-bred Exemption violated Section 10(c) of the ESA.  *See Cary v. Hall*, No. 05-cv-4363,

2006 WL 6198320 (N.D. Cal. Sept. 30, 2006).  In addition, this Court previously examined

whether Friends of Animals had standing to defend the FWS's removal of the Captive-bred

Exemption.  *See Safari Club Int'l v. Salazar*, 281 F.R.D. at 40.  All three cases found the

environmental organization to have "informational standing" under Section 10(c). This action is no different.

The D.C. Circuit recognizes that "a denial of access to information can work an 'injury in fact' for standing purposes, at least where a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.'" *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 22 (D.C. Cir. 2011) (quoting *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002) (quoting *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21, (1998))).  In *Feld*, the D.C. Circuit found that a plaintiff did not have informational standing to sue a private defendant for its treatment of elephants under Section 9 of the ESA, because "nothing in section 9 gives [the plaintiff] a right to any information." *Feld*, 659 F.3d at 23.  While the plaintiff brought "suit under the 'take' provision of ESA section 9, its claim to informational standing rests on section 10(c), which requires public disclosure of information contained in permit applications." *Id.* at 22.  In other words, for a party to maintain informational standing, the challenged action must violate the source of the informational right.  In *Feld*, the plaintiff alleged that the defendant's treatment of animals violated the take provision of Section 9, not the information provision of Section 10(c). Accordingly, the plaintiff in *Feld* lacked informational standing to pursue its claim.  Notably, during its analysis, the Court cited *Friends of Animals v. Salazar*, 626 F. Supp. 2d at 111, approvingly for "finding informational standing where plaintiffs alleged that the Fish and Wildlife Service violated section 10(c) by promulgating a rule that eliminated permit requirements for takings of certain antelope." *Feld*, 659 F.3d at 24.

Here, just as in *Friends of Animals v. Salazar*, the plaintiff claims that the promulgated rule (in this case, the Reinstatement Rule) violates Section 10(c) of the ESA.  Consistent with

*Feld*, 659 F.3d at 24, *Safari Club International v. Salazar*, 281 F.R.D. at 40, *Friends of Animals v. Salazar*, 626 F. Supp. 2d at 108, and *Cary v. Hall*, 2006 WL 6198320,  the Court holds that the plaintiff has informational standing to pursue its challenge under Section 10(c).

### 2.    The Plaintiff Lacks Standing to Challenge the Constitutionality of Section 127.

Although the plaintiff has informational standing to assert a challenge to the Reinstatement Rule under Section 10(c), the plaintiff does not have standing to challenge the constitutionality of Section 127.  The plaintiff contends that it has both informational standing and representational standing to challenge the constitutionality of Section 127.  As discussed below, the plaintiff is mistaken.

### a)    The Plaintiff Lacks Informational Standing.

While the plaintiff maintains informational standing to challenge whether the Reinstatement Rule violates Section 10(c) of the ESA, the plaintiff does not have informational standing to challenge whether Section 127 violates the Constitution.  As discussed, for informational standing to lie, the plaintiff must allege that the challenged action violates the source of the plaintiff's informational right.  *See Feld*, 659 F.3d at 23–24.  Unlike in the plaintiff's Section 10(c) claim, however, the plaintiff does not assert that the challenged action violates the source of any informational right.  Rather, the plaintiff contends that Section 127 violates the separation of powers doctrine embodied in the Constitution.  *See* Pl.'s Mem. Supp. Mot. Summ. J ("Pl.'s Mem."), at 11, ECF No. 16-1.  The plaintiff's informational rights are not implicated by its constitutional challenge and the plaintiff therefore lacks informational standing to pursue its constitutional claim.

b)      *The Plaintiff Lacks Representational Standing.*

The plaintiff also claims representational standing to pursue its constitutional claim. Organizations may "claim representational standing on behalf of their members," so long as "[1] [their] members would otherwise have standing to sue in their own right, [2] the interests [they] seek[ ] to protect are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members." *Natural Res. Def. Council v. EPA*, 755 F.3d 1010, 1016 (D.C. Cir. 2014) (citation omitted).  Thus, a representational standing analysis involves two distinct determinations: first, whether the organizations have put forward members who "would otherwise have standing to sue in their own right" and, second, whether the organizations themselves fulfill the remaining requirements for representational standing. *Id.*  In the present case, the plaintiff has not put forth a member who would otherwise have standing to bring this constitutional challenge.  Consequently, the plaintiff does not have representational standing to bring their constitutional challenge.

The plaintiff asserts two potential injuries in the present case.  First, the plaintiff argues that its President, Priscilla Feral, has an "aesthetic interest in wild antelope," and that Section 127 and the Reinstatement Rule harms this interest because of a resultant increase in poaching and laundering of wild antelope.[6]  *See* Pl.'s Mem. at 28–34; Decl. of Priscilla Feral in Supp. of Pl.'s Mot. Summ. J. ("Feral Decl.") at ¶42, ECF No. 16-2; Decl. of Priscilla Feral in Opp. to Defs' and Intervenor's Mots. Summ. J. ("Second Feral Decl.), ECF No. 21-1.  Second, the plaintiff asserts that Ms. Feral "has suffered aesthetic injury as a result of viewing tame animals in captivity on canned hunting ranches."  Pl.'s Mem. at 34–35.  Although the Federal Defendants assert that the plaintiff has abandoned its theory of standing premised upon Ms. Feral's interest

---

[6] As used by the plaintiff, "[a]nimal laundering is the act of illegally trading, trafficking, or smuggling both live animals and animal parts" whereby the wild animal "goes through a process to 'cleanse' its origin to make the [animal] look like it was legally obtained."  *See* Ex. A, Feral Decl.

in domestic antelope, *see* Fed. Defs.' Reply Supp. Cross-Mot. Summ. J. at 2, ECF No. 24, the plaintiff has made no such waiver.  Accordingly, the Court will address both of the plaintiff's remaining theories of standing.

i.       *Ms. Feral's Aesthetic Interest in Wild Antelope*

There are two overarching principles that apply to the plaintiff's theory that Section 127 and the Reinstatement Rule harm her interest in wild antelope in Africa.  First, this case involves the purported "standing to challenge a [regulation and statute] where the direct cause of injury is the independent action of a third party." *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1269 (D.C. Cir. 2007).  As will be discussed below, however, "courts [only] occasionally find the elements of standing to be satisfied in cases challenging government action on the basis of third-party conduct." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940 (D.C. Cir. 2004).  Second, and relatedly, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Defenders of Wildlife*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)); *Renal Physicians*, 489 F.3d at 1273 (noting "the heightened showing required of a plaintiff alleging injury from the government's regulation of a third party").

The D.C. Circuit has identified "two categories of cases where standing exists to challenge government action though the direct cause of injury is the action of a third party." *Renal Physicians*, 489 F.3d at 1275.  "First, a federal court may find that a party has standing to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action." *Nat'l Wrestling Coaches*, 366 F.3d at 940.  Importantly, in this category of cases, the challenged government conduct must authorize the

specific third-party conduct that causes the injury to the plaintiff.  *See Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) ("Supreme Court precedent establishes that the causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries . . . .").  In the present case, the challenged action—the reinstatement of the Captive-bred Exemption—does not authorize the poaching of wild antelope in Africa.  Second, standing has been found "where the record present[s] *substantial evidence* of a causal relationship between the government policy and the third-party conduct, leaving *little doubt* as to causation and the likelihood of redress."  *Nat'l Wrestling Coaches*, 366 F.3d at 941 (emphasis added).  The plaintiff must allege facts that are "sufficient to demonstrate a *substantial likelihood* that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought."  *Renal Physicians*, 489 F.3d at 1275 (emphasis added).  The Reinstatement Rule removes regulations regarding captive antelope, not wild antelope.  As a result, the plaintiffs face a "substantially more difficult" task in showing causation and redressability based on an injury to their aesthetic interest in wild antelope.  *Spectrum Five LLC v. Federal Communications Comm'n*, 758 F.3d 254, 261 (D.C. Cir. 2014).

Like the plaintiff's informational standing argument, prior courts have previously applied these principles to the plaintiff's standing argument.  While those decisions are not binding on this Court, they are nonetheless instructive with respect to the causation and redressability issues present in this case.

In *Cary v. Hall*, the Northern District of California addressed whether a group of environmental organizations had standing to challenge the Captive-bred Exemption based on an

injury resulting from their work with, and observation of, wild antelope.[7]  No. 05-cv-4363, 2006 WL 6198320 (N.D. Cal. Sept. 30, 2006).  The court held that the plaintiffs could not demonstrate the requisite causation to establish standing based on an injury to their interest in wild antelope.[8]  *Id.* at *6–*7.  The court noted that the Captive-bred Exemption "neither authorizes sport hunting in North Africa nor authorizes the importation of trophies taken in the wild."  *Id.*  As a result, the "causal link between the challenged regulation and [the plaintiff's] injury depends upon the unfettered choices of third parties."  *Id.*  In addition, the court noted that it would be unable to redress the plaintiff's injuries because "the legality of hunting the three antelope species in their native habitat is a matter far beyond the court's power."  *Id.*

Similarly, in *Friends of Animals v. Salazar*, the court followed the reasoning set out in *Cary v. Hall* and determined that the plaintiff lacked standing relating to its interest in wild antelope.  The court held that any injury to the plaintiff's aesthetic interest in wild antelope "was not caused by the [Captive-bred] Rule because the [Captive-bred] Rule does not authorize the take of *wild* antelopes or the importation of *wild* antelope parts or trophies."  626 F. Supp. 2d at 109 (emphasis in original).  In a carefully reasoned decision, the court examined the legislative history of the ESA and the D.C. Circuit's decision in *Animal Welfare Institute v. Kreps*, 561 F.2d 1002 (D.C. Cir. 1977), which held that a plaintiff had standing to challenge the Government's

---

[7] As noted above, *Cary v. Hall* was transferred to this District and consolidated with *Friends of Animals v. Salazar*, 626 F. Supp. 2d at 105.

[8] *Cary v. Hall* described the causal theory as follows:

> First, the challenged exemption will 'send[ ] the signal' that hunting the three antelope species in the United States is acceptable. . . . It is not clear whether this signal can be picked up by hunters around the world, only in the United States or nowhere beyond Texas, where most trophy hunting of the three antelope species takes place. . . . In any event, a signal is being broadcast and sport hunters somewhere, maybe everywhere, are tuning in. And for purposes of causation, these hunters must be tuning in for the first time because there is no dispute that, as a matter of federal law, it has long been legal to hunt captive-bred members of the three antelope species in the United States. Next, at least some hunters who receive the signal will journey to North Africa to search for one of the small number of scimitar-horned oryx, addax and dama gazelle that live in the wild—all because these hunters picked up the signal.  This is just so much speculation.

2006 WL 6198320, at *6.

alleged failure to enforce the Marine Mammal Protection Act based on an injury to the plaintiff's aesthetic interest in South African seals. *Friends of Animals* distinguished *Animal Welfare Institute* because unlike in *Animal Welfare Institute*, "there is no statutory language or legislative history [in the ESA] to support the idea that Congress decided, or even considered, whether permitting trade in species *bred in captivity in the United States* would create financial incentives for increased poaching abroad." 626 F. Supp. 2d at 109–110. Since there was not "any evidence that the [Captive-bred Rule] actually does increase the financial incentives for taking the antelope species in the wild," the court ruled that the plaintiff lacked standing on that basis. *Id.* at 110.

Finally, this Court addressed whether this plaintiff, Friends of Animals, had standing such that it could intervene in a case challenging the Removal Rule. Although this Court did not opine on whether Friends of Animals' interest in wild antelope could sustain standing—holding, consistent with the above analysis, that Friends of Animals had informational standing—this Court cited with approval the analysis contained in *Cary v. Hall* and *Friends of Animals v. Salazar. See Safari Club Int'l v. Salazar*, 281 F.R.D. at 41 (describing the "thorough analysis" of the prior opinions).

Despite the plaintiff's substantial burden to show causation and redressability, and the prior findings by multiple courts, the plaintiff nonetheless claims that it has standing to sue based on the harm to Ms. Feral's aesthetic interest in wild antelope. To overcome the causation and redressability concerns outlined by previous courts, the plaintiff claims that the requisite causal connection was recognized by FWS when it considered whether to delist the antelope. *See* Pl.'s Mem. at 30 ("FWS specifically found that captive African antelope in the United States can help drive 'increased take and trade in 'laundered' wild caught specimens.'" (citing 78 Fed. Reg.

33,790, 33,793)).  Specifically, in 2013, the FWS considered whether captive antelope and wild antelope should be afforded separate legal status under the ESA.  The FWS noted that should they be afforded separate status "the threat of overutilization would likely increase." 78 Fed. Reg. at 33,793.  In such a situation, "the taxonomic species would potentially be subject to increased take and trade in 'laundered' wild-caught specimens to feed U.S. or foreign market demand because protected wild specimens would be generally indistinguishable from unprotected captive-held specimens."  *Id.*  As a result, the FWS concluded that the similarity-of-appearance provision in Section 2(e) of the ESA would necessitate that the FWS "complete separate similarity-of-appearance listings for captive-held animals," which would "make captive specimens subject to the same restrictions as listed wild specimens."  *Id.*  Accordingly, the FWS did not afford the captive antelope and the wild antelope separate legal status.

Although the statements by FWS in determining whether to list separately captive and wild antelope shed light on the nature of the causal relationship between the two sets of animals, they are not sufficient to establish causation and redressability in the present case.  The FWS's statements that "the *threat* of overutilization [of wild antelope] *would likely* increase," 78 Fed. Reg. at 33,793, and that wild antelope "*would potentially* be subject to increased take," *id.*, do not establish that it is substantially likely, as opposed to potentially possible, that the Reinstatement Rule would result in harm to Ms. Feral's aesthetic interest in wild antelope.  *See Renal Physicians*, 489 F.3d at 1275.  While poachers might increase efforts to hunt wild antelope, any such efforts remain the "unfettered choice[]" of these third parties.  *See Defenders of Wildlife*, 504 U.S. at 562.  Moreover, although the plaintiff cites to scientific studies to buttress its causal arguments, those studies do not concern wild antelope and have little, if any, probative value here.  *See* Exs. A, B, F, Second Feral Decl. (illegal ivory trade); Ex. C, Second

Feral Decl. (species native to Brazil); Exs. D, G, Second Feral Decl. (poaching in the abstract);
Ex. E, Second Feral Decl. (green python trade).  The chain of causation is simply too speculative
and the possibility of redress too remote to afford standing to the plaintiff on this ground.  "When
redress depends on the cooperation of a third party, 'it becomes the burden of the [party asserting
standing] to adduce facts showing that those choices have been or will be made in such manner
as to produce causation and permit redressability of injury.'"  *U.S. Ecology, Inc. v. U.S. Dep't of
Interior*, 231 F.3d 20, 24–25 (D.C. Cir. 2000) (quoting *Defenders of Wildlife*, 504 U.S. at 562);
*see also Klamath Water v. Fed. Energy Reg. Comm'n*, 534 F.3d 735, 739 (D.C. Cir. 2008) ("In a
case like this, in which relief for the petitioner depends on actions by a third party not before the
court, the petitioner must demonstrate that a favorable decision would create 'a significant
increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury
suffered.'" (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002))).  The plaintiff has been unable to
meet this burden.

### ii.    *Ms. Feral's Aesthetic Interest in Captive Antelope*

The plaintiff also asserts standing based upon the harm to Ms. Feral's aesthetic interest
in captive antelope caused by "her visits to canned hunting ranches" and the "viewing [of] tame
animals that are later hunted in captivity."  *See* Pl.'s Mem. at 34–35.  The plaintiff faces two
distinct problems with this formulation of Ms. Feral's injury.  First, regardless of whether the
Reinstatement Rule stands in this case, hunting of captive antelope will be permitted under the
Section 10 permitting process.  Thus for the plaintiff's injury to be capable of redress, Ms. Feral
must have visited and intend to visit ranches that hunt captive antelopes without an otherwise
valid permit under Section 10.  Second, the plaintiff must adduce some evidence that Ms. Feral's
alleged injury is imminent.  Although the plaintiff argues in its brief that Ms. Feral "intends to

continue monitoring canned hunting ranches and visiting the antelope on these ranches," *see*

Pl.'s Mem. at 34, Ms. Feral's declaration states only that she will "continue to monitor the Y.O

Ranch and other sport-hunting facilities." *See* Feral Decl. at ¶ 41. Ms. Feral does not describe

how she intends to "monitor" the Y.O. Ranch, whether by subsequent visits or otherwise.

According to the record, Ms. Feral's last visit to a ranch containing captive antelope occurred in

2006. *See id.* at ¶ 39. In the intervening eight years, the plaintiff has not identified any visit to a

ranch containing captive antelope or *any plans* to visit such a ranch in the future. In contrast,

Ms. Feral's declaration does express a concrete intention to visit wild antelope in Africa. *See*

Feral Decl. at ¶ 23 ("I intend to ensure that a member of the FoA staff or I continue our regular

travels to Africa to see . . . African antelopes . . . . In fact, I have plans to go to Senegal every

year between November and January to check on the recovery efforts.").

 The generalized statements offered by the plaintiff in the instant case are not sufficiently

concrete to satisfy the requirement of imminent injury. *See, e.g.*, *Summers v. Earth Island Inst.*,

555 U.S. 488, 496 (2009) (holding that plaintiff's "vague desire to return is insufficient to satisfy

the requirement of imminent injury"); *Defenders of Wildlife*, 504 U.S. at 564 (holding that "the

affiants' profession of an 'inten[t]' to return to the places they had visited before . . . is simply

not enough" because "[s]uch 'some day' intentions—without any description of concrete plans,

or indeed any specification of *when* the some day will be—do not support a finding of the 'actual

or imminent' injury that our cases require" (emphasis in original)); *WildEarth Guardians v.

Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013) (finding standing because members of environmental

group submitted affidavits attesting to their "specific plans to visit the area regularly for

recreational purposes"); *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987) ("[I]t will not do

for [the plaintiff] to assert generally that he might one day return to Nicaragua. More immediate

and concrete plans are necessary."); *cf. Mendoza v. Perez*, 754 F.3d 1002, 1014 (D.C. Cir. 2014)

(finding that plaintiffs had standing as intended participants in job market where the plaintiffs

attested to their "specific experience," the "particular working conditions that led them to leave

the industry; the specific wages and conditions they would require to accept new employment as

workers; the manner in which they have kept abreast of conditions in the industry; and . . . a

specific possible avenue for obtaining reemployment").

*      *      *

Under any of the theories advanced by the plaintiff, the plaintiff lacks standing to pursue

its claim that Section 127 violates the Constitution.[9]

## B.      The Reinstatement Rule Does Not Violates Section 10(c) of the ESA

The plaintiff devotes but a single sentence to its argument that the Reinstatement Rule

violates Section 10(c) of the ESA, directing the Court to the prior decision striking down the

Captive-bred Exemption in *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. 2009).

*See* Pl.'s Mem. at 26. Were this Court considering the Reinstatement Rule solely by its own

---

[9] Even if the plaintiff maintained standing to bring suit, Section 127 is valid under the Constitution. The plaintiff argues that under *United States v. Klein*, 80 U.S. 128 (1871), Congress may not pass a statue dictating the result of pending litigation without amending the substantive law, *see* Pl.'s Mem. at 12–24, a "proposition on which [the D.C. Circuit] express[es] no view," *see Nat'l Coal. To Save Our Mall v. Norton*, 269 F.3d 1092, 1096 (D.C. Cir. 2001). As the D.C. Circuit has recognized, "*Klein's* exact meaning is far from clear," *see id.* at 1097, and as another judge on this Court has observed "*Klein* is rarely (if ever) successfully invoked in constitutional challenges to federal statutes," *see Wazir v. Gates*, 629 F. Supp. 2d 63, 66 (D.D.C. 2009). As a result, courts have upheld statutes with analogous language against similar constitutional challenges under *Klein.   See, e.g.*, *Save Our Mall*, 269 F.3d at 1094–97 (holding that statute requiring the World War II Memorial be built consistent with the existing permits "[n]ot withstanding any other provision of law" amended "the applicable substantive law" and did not run afoul of *Klein*); *Alliance for the Wild Rockies v. Salazar*, 672 F.3d 1170 (9th Cir. 2012) (holding that where "Congress has directed the agency to issue [a] rule 'without regard to any other provision of statute or regulation that applies to issuance of such rule' . . . Congress has amended the law" and does not offend the Constitution). Moreover, where there is ambiguity regarding whether a statute amends the substantive law, and therefore whether it is constitutional, "the court [is] obligated to impose [a] saving interpretation as long as it [is] a possible one." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 441 (1992). In the present case, Section 127 amends the applicable law and does not run afoul of the Constitution. In addition, Section 127 does not run afoul of *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 225 (1995), which holds that Congress may not enact "legislation that prescribes what the law *was* at an earlier time" and then require the law's "application in a case already finally adjudicated." Section 127 does not establish what the law was at a prior time or require its application to a case already adjudicated. Rather, Section 127 directs the FWS to issue the Reinstatement Rule, thus establishing what the law will be prospectively.

terms, the Court might likewise agree with the prior decision.  Unfortunately for the plaintiff, however, Section 127 guides the Court's analysis regarding the legality of the Reinstatement Rule.  Section 127 directs the FWS to reissue the rule "without regard to any other provision of statute or regulation that applies to issuance of such rule."  Pub. L. No. 113-76, 128 Stat. 5, § 127.  Accordingly, Section 10(c) does not apply to the Reinstatement Rule and the FWS's actions in promulgating the rule were compelled by the statute, consistent with congressional intent, and therefore not arbitrary or capricious under the APA.  *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014) ("'Normally, an agency rule would be arbitrary or capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" (quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that the Federal Defendants and the defendant-intervenor are entitled to summary judgment.  Accordingly, the motions for summary judgment of the Federal Defendants and the defendant-intervenor are granted and the plaintiff's motion for summary judgment is denied.  An appropriate Order accompanies this Memorandum Opinion.


Date:  March 4, 2015


_____
BERYL A. HOWELL
United States District Judge